# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-25-00037-CR

---

**Edward Figueroa, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 26TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 22-1471-K26, THE HONORABLE DONNA GAYLE KING, JUDGE PRESIDING

---

### **O P I N I O N**

A jury convicted appellant Edward Figueroa of murder and assessed his punishment at life imprisonment and a $10,000 fine. *See* Tex. Penal Code §§ 12.42(d), 19.02(b). The trial court sentenced him in accordance with the jury's verdict. In four issues on appeal, Figueroa contends that the evidence was insufficient to support the jury's guilty finding, that the guilt-innocence jury charge included an erroneous felony-murder instruction, and that the trial court abused its discretion by denying his motion for mistrial and by admitting extraneous-offense testimony for which he did not receive pretrial notice. We modify the trial court's nunc pro tunc judgment of conviction to correct a clerical error and affirm the judgment as modified.

### **BACKGROUND**

The State charged Figueroa with murdering his girlfriend, Kathryn Lynn Gibson. At the time of the alleged murder, he was around forty-two years old, and she was around

twenty-four. The indictment contained three paragraphs, each alleging one of the three statutory manners of committing murder:

[O]n or about the 12th day of August 2022, in Williamson County, Texas, Edward Figueroa, hereinafter "defendant", did then and there

**Paragraph 1**

intentionally and knowingly cause the death of an individual, namely Kathryn Lynn Gibson, by shooting Kathryn Lynn Gibson with a firearm;

**Paragraph 2**

with intent to cause serious bodily injury [(SBI)] to an individual, namely, Kathryn Lynn Gibson, commit an act clearly dangerous to human life that caused the death of Kathryn Lynn Gibson by shooting Kathryn Lynn Gibson with a firearm;

OR

**Paragraph 3**

commit or attempt to commit a felony, namely Aggravated Assault with a Deadly Weapon against Kathryn Lynn Gibson by intentionally, knowingly and recklessly cause [SBI] to Kathryn Lynn Gibson by shooting Kathryn Lynn Gibson and the defendant used or exhibited a deadly weapon, namely a firearm during the commission of the assault, and in the course of and in furtherance of the commission or attempt, the defendant committed or attempted to commit an act clearly dangerous to human life that caused the death of Kathryn Lynn Gibson by shooting Kathryn Lynn Gibson with a firearm.

Figueroa did not dispute that he shot Kathryn; the question at trial was instead whether her death was murder or an accident.

Robert Corey Hildebrandt, Figueroa's friend and mechanic, testified that on August 12, 2022, the two men went out for dinner and then to a pool hall. Figueroa's demeanor during the outing was normal. He had one or two drinks; was not annoyed or upset; and used his

2

phone only once, to call Kathryn and ask if she wanted him to bring her takeout. He ordered food for her at the restaurant.

Lisa Gomez, who knew Figueroa through her husband Steven Gomez, testified about a phone call that Steven received from Figueroa that night. Lisa and Steven rushed to Figueroa and Kathryn's house in Leander, Texas, and Steven asked Lisa to wait in the car. The couple exchanged only "very sporadic text messages" afterward; Steven's first text warned, "Stay in the car, it's bad." After not hearing from Steven for some time, she drove home. When he finally responded, he asked her to return to Figueroa and Kathryn's house. On getting into the car, Steven yelled and told her to leave; he called 911 as she drove away, and she parked at a strip mall to await officers. She later picked up Figueroa and Kathryn's infant son from Figueroa's car. The child had no clothes.

Steven Gomez testified about what occurred inside Figueroa and Kathryn's house as well as about their relationship and their attitudes toward firearms. Although Steven and Figueroa had been friends since 2017 and considered themselves brothers, Steven was not close to Kathryn, whom he and Figueroa referred to by the nickname "Buns." Steven received the "erratic" call from Figueroa—who sounded "excited" and "worried"—around 11 p.m. on August 12. During the call, Steven heard Figueroa say, "Buns, get up, Buns, get up."

Steven, who had military and law-enforcement experience, parked down the street from Figueroa and Kathryn's house because he had been trained to do so when responding to "a family violence call" to obtain "the element of surprise" in case "someone is coming, shooting through the door." On entering the house, he saw food on the floor; from past visits, he was aware that an ottoman had previously been where the food was spilled. Figueroa was dressed only in his

3

underwear, and there was blood on the right side of his body, which he rinsed off at the kitchen sink.

Steven saw Kathryn "laying—or sitting on the floor bleeding." When he asked what happened, Figuera told him that "they had got[ten] into a fight and that between them arguing, he had accidentally shot her in the face" with a handgun. Figueroa added that Kathryn "tried to swing and hit him in the face" and that he had attempted to block her punch with his hands. Steven "associated that with how the shooting occurred," and Figueroa explained that it had been "an accidental response of some sort." Figueroa said that after shooting Kathryn, he had "a stupid thought" and put the handgun in her hand to make it look like she committed suicide. He changed his mind after realizing that it would not "make sense." He told Steven that he had also moved her "[t]o put her down on the ground" and had attempted to perform CPR. Steven did not call the police from the house because Figueroa was "frantic," "really scared," and "suicidal." When Steven suggested that they call 911, Figueroa responded, "No, no, I just want to leave." He also said that he could not believe that he had ruined his life and that he did not want to go to jail.

At one point, Figueroa gave Steven an AR-15 rifle, from which Steven removed the magazine and which he put under a bed. When Steven had been in the house for around three hours, Figueroa went upstairs and came down holding a Glock handgun "at the low ready," meaning he was "aiming it down like at a 45-degree angle." Steven took the handgun from him, removed the magazine, confirmed that there was no round in the chamber, and put the firearm in his pocket. Eventually, Figueroa packed two suitcases with shoes and "random clothes" from the closet in the downstairs primary bedroom; Steven suggested that he pack diapers and a bottle, but he did not see Figueroa do so. Three or four hours after Steven entered the house, he was able to leave and call 911. A recording of the 911 call was played for the jury.

4

Regarding Figueroa and Kathryn's relationship, Steven testified that the couple had joked a lot with each other and that around a year before her death, Figueroa had given her a promise ring—which Steven identified as a ring found on the floor near her body. However, Steven and Figueroa had conversations about her fidelity, and Figueroa once said that he believed she had cheated on him. He also said that he made her take a polygraph test, which Steven thought was "crazy." Steven never saw Kathryn with her own friends, and Figueroa was the "primary breadwinner" in the relationship. Steven did not think that Figueroa would have allowed her to leave with their son; he had told Steven that he "wouldn't let her take him."

Steven and Figueroa had previously discussed firearm safety, including always being aware of where a firearm is pointed; knowing that "wherever you're pointing is where you're going to shoot"; and "always hav[ing] your finger straight out to the side of the trigger, never on the trigger." According to Steven, both Figueroa and Kathryn owned firearms. In addition to the AR-15, Figueroa "always had two or three pistols in the house," including the Glock, and she "had guns as well." Steven believed that the handgun used in the shooting had belonged to her. He testified that when Figueroa was at home, he would always have a firearm nearby or on his person, although he would not "just walk[] around with it" in his hand unless moving from one room to another. Steven ensured that his own firearm always had a round in the chamber, which meant that while it could "accidentally go off" if the trigger was depressed, he did not need "to rack the slide to get a round in the chamber." Figueroa preferred for safety reasons not to keep rounds chambered in his firearms. When Figueroa went to Steven's house, he would make Steven "unrack the bullets in [his] guns' chambers." Steven understood that Kathryn, like him, had been taught to keep rounds in the chambers of her firearms. He agreed that if Figueroa did not allow Steven to keep a round chambered, he would not "have let Kathryn have a round in the chamber." Steven

5

testified that one week before Kathryn's death, someone may have attempted to break into her and Figueroa's house because an alarm went off. The incident left Kathryn concerned.

Prior to Steven's testimony, the parties had agreed to partially redact the 911 call that was played for the jury. The day after Steven testified, however, the parties informed the trial court in a hearing outside the jury's presence that the unredacted version had been published, which included Steven's statement to the dispatcher, "I was just like, 'Dude, if it was legit an accident like you're saying, then there's nothing wrong.' And [Figueroa]'s like, 'But I'm a two-time felon.'" During the hearing, defense counsel objected to the publication of the unredacted recording "based on 404, 403," and requested "a limiting—or a—that instruction, the general instruction in the general [c]ourt's [c]harge." Counsel stated, "We would not ask the [c]ourt to specifically instruct the jury now because we don't want to draw any further attention to that." The trial court agreed to include the requested instruction in its written guilt-innocence charge. Counsel next moved for a mistrial, which the trial court denied.

Williamson County Sheriff's Office (WCSO) Deputy Tyler Navarro testified that around 3:17 a.m. on August 13, after learning that the Leander Police Department (LPD) was looking for a silver Kia Optima, he observed Figueroa's car, which matched the description, driving southbound on the 183A Toll Road. When Deputy Navarro got behind Figueroa, he immediately changed lanes, exited the toll road, and ran a red light. The deputy accelerated to over 100 miles per hour but lost track of Figueroa's car. Deputy Navarro learned that it had been stopped by the Cedar Park Police Department (CPPD). He went to the site of the traffic stop and confirmed that the stopped car was the one that had evaded him.

CCPD Sergeant Thomas Lightenheimer, whose body-cam video was admitted into evidence, testified about his traffic stop of Figueroa on the morning of August 13. Figueroa

6

appeared to know that an officer had previously followed him; he was slow to provide his driver's license, which led Sergeant Lightenheimer to think that he was being evasive or was trying to conceal his identity. Sergeant Lightenheimer thought it was odd that while Figueroa's driver's license gave a San Antonio address, he was in Cedar Park and was headed away from San Antonio. Figueroa, who was nervous and sweating, told Sergeant Lightenheimer that he lived in San Antonio and was in Cedar Park to visit friends. When Figueroa overheard traffic on Sergeant Lightenheimer's radio, he informed the officer that he was the one for whom police were looking.

Haley Spence, a former crime scene and evidence supervisor with LPD, testified about a search of Figueroa's car and two searches of his and Kathryn's house. From the car, Spence collected three suitcases containing hats, dryer sheets, marijuana, and THC products.

A walk-through video of the house and photographs taken by Spence were admitted into evidence. On the floor near the front door were spilled containers of takeout food and a bag, inside of which were unopened containers of alcohol. Kathryn's body was lying on top of a t-shirt against a wall in the living room. On the floor near her body were a loaded pistol, a box for the pistol[1] in which were 9mm "ammo magazines" and "quite a lot" of ammunition, the promise ring, and an iPhone. She was wearing a second ring, and another iPhone was found on a couch in the living room. Bloody footprints led from her body to the kitchen, and a bloody diaper and a gallon of milk were on the kitchen counter. Spence located a spent shell casing on the kitchen floor next to a chair, on the other side of the wall against which Kathryn was lying. Spence also located a projectile, which had apparently passed through the wall of the living room opposite the wall against which Kathryn was lying before striking a different wall and falling to the floor. From

---

[1] Spence testified that the pistol and box were connected by their serial numbers.

Kathryn's height and where the projectile struck both walls, Spence determined that it had traveled upward. However, she clarified that she was not a shooting-reconstruction expert and "wasn't able to do an actual trajectory of it." She explained that "[w]herever a bullet strikes, that can change its trajectory, so even going through the victim first could change [it]." She recovered the pistol's magazine and sent the pistol to the Department of Public Safety (DPS) crime lab for testing to determine if the spent shell casing and projectile had come from it.

Spence observed that the closet of the downstairs primary bedroom contained only men's clothing and shoes in men's sizes. Women's clothes and shoes were laid out next to a bag on a bed in an upstairs bedroom. From a trash bag in the garage, Spence collected a hat with "possible bloodstains on the rim inside." She noted that the bloodstains "could only be on the hat there if it had been worn when blood was moving."

Laura Edelman, the Travis County deputy chief medical examiner, testified regarding the results of Kathryn's autopsy. The cause of Kathryn's death was "a gunshot wound to the head," and the manner of death was homicide. Her eyes were open when the firearm was fired, which Edelman agreed could indicate that the gunshot was unexpected. Stippling—marks caused when unburned gunpowder strikes the skin and scratches or is embedded into the skin around the wound—indicated that the muzzle was between several inches to three feet from the skin's surface when the firearm was fired; Edelman agreed that "we're closer to a few inches than we are to three feet." The trajectory of the gunshot was "directly front to back" and "slightly upward." Although Edelman could not say how the shooter had been positioned relative to Kathryn, Edelman testified that "[t]he gun was pointed at the face," and elsewhere testified that "there are several features of this particular injury that clearly demonstrate that the muzzle of the gun was pointed, basically, perpendicular to the decedent's face, not like angled."

8

Edelman did not see evidence of medical intervention or life-saving measures, including CPR, "whether by trained individuals with medical equipment or untrained CPR." While broken ribs or chest bruising is not guaranteed when a layperson performs CPR, Edelman agreed that she would have expected to see some indication if CPR had been attempted.

Edelman documented Kathryn's injuries other than the gunshot wound. In addition to abrasions on her right ear, Kathryn had a bruise on the "left angle" of her jaw, a purple and yellow bruise on the left side of her jawline, brown bruises on the left side of her chest and on her left hip, purple bruises on her left forearm and the back of her left hand, and "several bruises o[n] the front of the lower legs that were just sort of scattered on the shin surface of the leg." Edelman testified that while there is no way to accurately age bruises, yellow discoloration—such as was present in the bruise to Kathryn's jawline—"does indicate some level of healing[,] . . . meaning it did not occur around the time of death."

Jeffrey Kelly, a DPS firearms and toolmark examiner, testified concerning the results of his examination of the handgun found next to Kathryn's body as well as the spent shell casing and the projectile recovered from her and Figueroa's house. The handgun was a 9mm Glock Model 17 semiautomatic pistol. A semiautomatic pistol is "a firearm that will fire and continue to fire as you pull the trigger until either you stop pulling the trigger or the firearm is out of ammunition, and it ejects the cartridge and then loads the next round to be fired a second time." Glock pistols lack external safeties but have three internal safeties that must all be disengaged for a pistol to fire: a trigger safety that must be depressed at the same time the trigger is pulled for the pistol to fire, a firing pin safety, and a drop safety that prevents the pistol from discharging if accidentally dropped. The handgun recovered in this case required approximately seven pounds of pressure to fire, about the same as needed to open a Coke can. Kelly observed no malfunctions

when testing the handgun. Seventeen cartridges fit in its spring-loaded magazine, "plus one in the chamber for a total of 18." Kelly determined that the spent shell casing and the projectile were both fired by the handgun.

On cross-examination, Kelly testified about the "two ways for a round to get into the firing chamber" without the handgun needing to be fired first. A person could drop a round into the barrel and manually shut the slide, but the "more common way would be to actually pull the slide back and release it, which would use the—this spring action and the extractor would push the bullet cartridge into the firing chamber area." Kelly agreed that with respect to semiautomatic firearms, there is no way to get a round into the chamber without activating the slide.

Georgetown Police Department Detective Sarah Lewis, who assisted on the case at LPD's request, testified about text messages and Internet browser and call logs recovered through extractions from two iPhones belonging to Kathryn. One phone (Phone 1) had more, and more recent, activity than the other (Phone 2).

The text messages were sent between July 9, 2022, and August 12, 2022, the date of the shooting. In them, Figueroa frequently accused Kathryn of cheating and asked where she was or whom she was with, only for his texts to become more mundane and "normal" a day or two after the accusations. She in turn often asked where he was and if he was okay. Lewis testified that Figueroa's behavior was a "common thing that we find in a family violence type relationship." Although Lewis agreed that Kathryn was able to talk to friends and family, the "vast majority of communication" on her phones was with Figueroa. In his texts to Kathryn, he repeatedly called her a "bitch"; warned multiple times, including on the day before the shooting, "You better not ever fuck up on me"; told her that she was "fucking up [his] LIFE"; demanded that she send him

10

her location; and declared that their relationship was over and that she needed to "get out." Around a week before her death, he texted, "Your face . . . [n]eeds makeup."

Kathryn "did not have very much social media activity at all," which was unusual for somebody her age. There was a voicemail on one of her phones from a polygraph service asking whether she was still interested in taking a polygraph.[2] And two days before her death, she accessed a United States Postal Service (USPS) change-of-address form on the USPS website using her phone's browser. Her call log showed that on the day of the shooting, Figueroa called her ten times using Facetime video between 4:30 p.m. and 10:45 p.m. The final two calls were unanswered.

Kathryn's friend, Tanner Hill; cousin, Molly Quarnberg; and mother, Janet Koch, testified about their perceptions of Figueroa's and Kathryn's relationship. Hill testified that Kathryn met Figueroa when he was on vacation in California. She moved to Texas to live with him within six months of their meeting. Although she had been very active on social media, when she moved to Texas, she changed her phone number and deleted all of her social media accounts; she told Hill that Figueroa had made her delete them. Kathryn still had a Facebook account but "never got on it." Hill testified that Figueroa once got drunk at dinner, became irate, and yelled and cussed at Hill for suggesting that he should not drive. Hill never spoke to Kathryn again after that night.

Quarnberg testified that Kathryn had no friends or family in Texas and that she and Kathryn went from being "pretty much inseparable" when they lived together in California to

---

[2] The record does not show when the voicemail was left on Kathryn's phone.

almost losing touch after Kathryn moved to Texas. When Quarnberg, Kathryn, and Figueroa were in California, he let them socialize but was "never far away."

Both Quarnberg and Koch testified that Kathryn, having been around firearms her entire life, knew a great deal about how to handle them and about firearm safety. Koch testified that Kathryn became "very secretive" after moving to Texas; Koch only learned Kathryn's address after she had been in Texas for almost three years and did not learn she was pregnant until her third trimester. Koch felt that she "wasn't welcome to talk to [Kathryn]." Around three weeks before Kathryn's death, Figueroa called Koch and said that he wanted Kathryn "out of [his] house" because "she was not contributing financially." Koch and Kathryn made a plan and arranged for Kathryn and her and Figueroa's son to live with Koch in Oklahoma. At the time of Kathryn's death, Koch had "set up a room for her" and "thought she was coming like maybe the next day or sometime very soon."

Patty Conner, a domestic-violence expert, testified that controlling behavior eventually leads to violence, which while not necessarily involving physical violence, becomes more physically violent over time. She testified that isolation of an abuse victim does not mean that she is completely cut off from everyone else but agreed that if a friend of the victim challenged the abuser, the friend would be cut off "immediately." Conner also testified that in every example of the "power and control" dynamic she had seen, the abuser had accused the victim of infidelity. She further testified that when an abuser kills his victim, the violent act—but not the result—is intended. Conner testified that if a victim stopped responding to her abuser, "it would result in punishment or retribution."

According to Conner, a victim who tries to leave or has left an abusive relationship is eight times more likely to be killed than had she stayed in the relationship; preparing to leave is

as dangerous as trying to leave. Conner testified that an abuser might tell a victim to leave because "it makes her feel unwanted, unloved, unworthy. It destroys her self-esteem." However, the intention is not for the victim to in fact leave.

Figueroa testified in his case-in-chief and offered his account of his and Kathryn's relationship and about what occurred on August 12. He denied murdering Kathryn but agreed that the shooting occurred on August 12 in Williamson County, Texas; that he was "the person with the gun in [his] hand"; and that he caused her death.

According to Figueroa, he and Kathryn began dating in 2017, and their son was born in 2021. The ring found next to Kathryn's body was a promise ring that he had given her; she wore it all the time, but it was too big for her finger, and she had intended to have it resized. He "sold THC products" for a living—by which he acknowledged he meant he was a "drug dealer"—and agreed that he had moved to Texas to sell drugs. Kathryn had known what he did and had helped with the business until he decided to end her involvement out of concern for her safety. At the time of her death, they were planning to start a trucking business once he stopped selling drugs, but Kathryn—who was in charge of the couple's finances—was spending their savings on clothes. He had texted her to leave because he was frustrated by her spending habits. He called Koch to "talk some sense into" Kathryn. He knew that if they broke up, Kathryn would have custody of their son because "that's his mom and I believe that every kid should be with his mom, and especially me doing what I was doing, I couldn't have a kid." He was aware of Kathryn having visited the USPS site; she had done so only because he asked her to leave. Similarly, he was aware of her plan to move in with Koch and had discussed it with Kathryn.

Figueroa denied controlling behavior. Although he had questioned Kathryn's faithfulness, she had given him no reason to; rather, his accusations were caused by his guilt from

13

cheating on her at the time. Moreover, she had known about his cheating and had volunteered to take the polygraph, calling the company on her own initiative. He asked her to delete her social media only to protect his privacy because of the nature of his work; she had other ways to contact friends and family, and he "never got in the way of any of that." He did not know why Kathryn would have told Quarnberg that he forbade them from talking.

Nevertheless, text messages from February and April 2021—when Kathryn was pregnant—and portions of Figueroa's testimony indicated that there were longstanding problems in their relationship. When asked if she had no one in Texas but him, he replied, "I guess you can say that." He testified that on Christmas Eve in 2020 he texted her, "I know what I want for Christmas, a lie detector test" because "she had initiated it, so I was just kind of—that—." He did not know why Steven testified that Figueroa said he had made Kathryn take the test. When in February 2021 she texted, "You've only been talking to me when you need me to do something," Figueroa replied, "You wanna talk to someone else by all means go ahead but you better be ready for the repercussions . . . . And don't think I ain't watching you." He testified that by "repercussions" he meant her having to leave and live on her own.

The following day, Kathryn suggested that Figueroa was feeling guilty because of his cheating, and he responded, "You can't respect that go be somewhere else." After she texted that she had never respected his cheating, he threatened, "I'll drive there right fukn now," which he testified was "just [him] talking shit." He continued to send insulting or menacing texts to her throughout the day, including "I just want my son . . . . Fuck you . . . . You have no idea what your doing"; "I want you to know that you really fukd up"; and "Have a great last night and take

14

good care of my daughter[3] . . . . OR ELSE." He testified that he did not know what he meant by "or else" but agreed that there appeared to be "a pattern of [his] making threats toward Kat[hryn] in [his] text messages." Another example was evidenced by the following exchange:

Figueroa: You don't realize what your doing

Kathryn: All I'm doing is saying how I feel and how you've hurt me

Figueroa: I will be there in the am

Figueroa: I CANNOT WAIT

Figueroa: I won't touch you. I'm not gonna hurt my child ever over your stupid ass

Kathryn: Ok

Figueroa: You gonna learn though

Asked what he meant by the last text, Figueroa testified, "I don't know. This was a long time ago. I was just being stupid. There were several times."

Similarly, after the confrontation with Hill about Figueroa intending to drive after drinking, Figueroa texted Kathryn that he was packing her things. He then sent texts, including:

- Fuck you bitch idk who you think I am

- I like how you thought shit was funny

- I'll remember that

- You really got me fukd up

- I promise you fukd up

_____

[3] Figueroa was referring to one of his six children by women other than Kathryn. Only his and Kathryn's infant son lived with the couple.

- This is on you . . . . You did this

When he texted, "You probably won't be seeing her on purpose again," Kathryn replied only, "Yeah I know."

Figueroa dismissed other seemingly concerning evidence as innocuous. Kathryn had to text him when she turned off the house's alarm "[b]ecause of protection" and so that he did not "freak out and hurry home." She told him what she was doing on several occasions and sent him a map of her location because she "wanted to show [him] where she was at." The bruises on her jaw were hickeys, and he told her that she needed makeup so that she could hide a hickey. And while the clothes and backpack on the upstairs bedroom were hers, they had been from a trip to California for her grandmother's funeral two days before Kathryn's death. He had no explanation, however, for why he had once timed how long Kathryn was gone from the house. Nor did he know how the bruises on her arm, shins, and hand were caused.

Figueroa testified that he "had some guns at the house" and that Kathryn stored several firearms in a closet and kept a ".380" with her. Both of them owned Glock 17s, which he distinguished by their magazines: she had "the standard magazine," and he had purchased a different one after buying his handgun. She kept her Glock 17 in a "Glock box" case in a drawer in their bedroom; it was this case that was found next to her body and to the handgun used in the shooting. He realized that the handgun he had picked up from the couch was hers only after he later found his own Glock 17 upstairs. He had been holding his Glock 17 when he came downstairs while Steven was at the house on August 12. Although Figueroa testified that he always ensured there was a gun in the room he was in and that he would carry one from room to room as needed,

he also testified that he only stored a gun in "two possible places":  on the couch or in a drawer in the kitchen.

Figueroa never had firearms training and would ask Steven about firearm safety. Figueroa had never heard of the rule to keep one's finger off the trigger.  But he explained that he always kept his firearms "unloaded," meaning without a chambered round, and would ask Steven to unchamber rounds from his firearms when he went to Steven's house because Figueroa otherwise felt uncomfortable.  Kathryn had always kept a round chambered but stopped after Figueroa asked her not to do so because he felt unsafe.  While they were both "pretty rattled" by the alarm going off at their house a week before her death, he testified that he lacked "any reason whatsoever to think that Kathryn went back to loading her guns after that incident."

On cross-examination, Figueroa—contradicting his earlier testimony—agreed that Steven had "certainly" told him "things like never have your finger on the trigger" and that Kathryn "certainly would have never had a round in her chamber in her gun either."  However, he then testified that she could have racked the slide to chamber a round before putting the handgun into its case.  He agreed that he was "telling the jury that Kat[hryn] had a round in the chamber even though she knew that [his] rules were to never have a round in the chamber."

On August 12, Figueroa left for Hildebrandt's shop around 3:30 p.m.  Figueroa and Kathryn called and texted throughout the evening, and he picked up takeout for her.  He initially testified that he and Hildebrandt had "a few beers" before testifying that it was actually "[j]ust a couple" and "like two" and, finally, "[t]wo beers."  Figueroa and Kathryn were supposed to have a movie night, and he stopped at a convenience store to get groceries and "a couple of alcoholic beverages," which Kathryn asked him to buy.

17

When he got home, he set the takeout on the ottoman, which was just inside the front door, and rushed to the restroom. He eventually moved the ottoman to keep his son from going upstairs but was not sure what had happened to the food and drinks that had been on it. He agreed that as documented in Spence's photographs, the food was "all over the floor," and the container—which was "ripped in two pieces"—appeared to have been "kicked or something."

After using the restroom, Figueroa picked up a handgun from the couch, went into the kitchen, set it down, and smoked marijuana while talking to Kathryn, who was standing by the kitchen counter. Next, he picked up the handgun again and walked toward the living room. She asked where he had been, and he answered that he had been with Hildebrandt. She then playfully said, "You better not have been fucking some bitch," and gave him a "little push . . . like play-fighting." He was holding the handgun in his right hand and gesturing while he talked; he did not remember if his finger was on the trigger, but he had assumed the handgun was "unloaded" because "all of the guns at the house were always unloaded."

Kathryn, still being playful, raised her left hand to strike him, and he "put [his] hands up in like a reflex, like a reaction." He did not "consciously" put his finger on the trigger or remember pulling it, but he heard the gunshot and saw her fall down. Before seeing the entry wound, he tried to pick her up by her hands; grabbed her face; shook her; and slapped her a few times, saying, "Buns, what did you do, Buns." He laid her down, took off his shirt, put it under her head to stop the bleeding, and attempted to administer CPR by "pushing on her stomach and breathing in her mouth." However, he then decided that he "didn't want her laying down" and "pushed her—scooted her here and sat her up." He did not know how his hat got on the floor and did not remember removing his socks or shorts in the kitchen. Kathryn died within eleven minutes of Figueroa arriving at the house.

18

Figueroa tried to call 911 using his smart speaker, but it was turned off. He instead used his cellphone to call Steven because he was an "ex-cop" and "would know what to do, the right thing to do." Figueroa testified that he thought Steven would call the police. Figueroa did not call the police himself in part because he feared they would find his drugs and refuse to believe that Kathryn's death was an accident because he was a drug dealer. He could not remember if he called his parents before calling Steven but called them from Steven's phone.

After Steven left Figueroa and Kathryn's house, Figueroa put his suitcases in his car and began driving to his cousin's house in Avery Ranch to drop off the drugs before returning home. He fled from the police because of the presence of drugs. He did not know why he failed to give Sergeant Lightenheimer his driver's license immediately, nor did he know why he told the sergeant he was from San Antonio and was just visiting the area. Figueroa testified that while he left his cellphone in the house, he did not leave it because it could be tracked by law enforcement. His phone had no stored contacts because it was brand new, but he did not know why it would not have recorded his call to Steven that night or the messages between him and Kathryn. Asked whether he had deleted records from his phone while Steven was at the house, Figueroa testified, "No. I don't recall that at all."

Figueroa testified that he trusted Steven, whom he considered his best friend. Yet Figueroa testified that Steven told the truth "for the most part" and contradicted Steven's testimony. In addition to not knowing why Steven testified that Figueroa had said he made Kathryn take the lie detector test, Figueroa testified that Steven was lying if he said that Figueroa and Kathryn argued on August 12 or that Figueroa asked him whether he could see bruises on her face. While Figueroa did not remember putting the handgun in Kathryn's hand to make her death look like a suicide, there was a "good chance" he did so and told Steven about it. Figueroa testified

19

that although he asked Steven not to call 911, Steven told him that he was going to call the police, and Figueroa knew that Steven would tell them everything that Figueroa had said.

Steven had visited Figueroa in jail "several times." Asked whether he told Steven that his "people" were watching him and that if Figueroa lost, it would be because of him, Figueroa replied, "I didn't say it in those words. He misinterpreted." Figueroa agreed that he told Steven to "go home and think about what I would do, how—meaning—because . . . he really wasn't being too supportive like I would have been." Asked if he would agree that his statement could be interpreted as an attempt to influence Steven's testimony, Figueroa answered, "Well, I seen that through a text message. Yes."

After Figueroa rested his case-in-chief, the State called Steven as a rebuttal witness. Steven testified about discussions he had with Figueroa regarding abuse in Figueroa and Kathryn's relationship. Figueroa asked Steven "a handful of times" whether he was able to see bruises on her face through makeup she was wearing. On one such occasion, Figueroa told Steven that the couple had been fighting and indicated that he caused the bruises.

On cross-examination, Steven explained that he had not mentioned Kathryn's facial bruises when speaking with police and had told them that pushing was "the extent of physical interaction" between her and Figueroa because officers asked only whether Steven had seen domestic violence, not whether Figueroa had told him about it. Steven likewise acknowledged that he had previously informed defense counsel that Figueroa denied ever hitting Kathryn. Asked why he had changed his testimony, Steven initially testified, "On the stand I'm here having to tell the truth. I'm not going to lie up here." He later testified that he was revealing the domestic violence because his relationship with Figueroa had changed in light of the threat at the jail. Steven maintained that he had previously been telling the truth as well but explained that he had been

20

"trying to protect" Figueroa and "didn't want to maliciously lie." Steven added that while Figueroa had a habit of giving hickies, Steven had only ever seen them on the necks of Figueroa's partners. Steven agreed that "everything [Figueroa] did that night indicates he did have something to hide."

Steven also testified that he never told Figueroa he was going to call the police and that Figueroa had refused Steven's offer to allow Figueroa to leave with his and Kathryn's son and a head start before Steven called 911. Steven testified that he did not recall Figueroa being happy that Steven told officers what happened.

In addition, Steven testified that when Figueroa came downstairs carrying his Glock 17 at the low-ready, the firearm's positioning was significant because it was a position that "someone with experience handling guns would be holding the gun in." Steven further testified that he noticed the handgun had an extended magazine, which is "extra[-]long"; a standard magazine holds eight cartridges, but Figueroa's held nineteen. Steven testified that someone with firearms experience "would know whether or not an extended magazine was in a firearm."

Lastly, Steven testified about his visit to Figueroa in jail on August 16, 2024. Figueroa told Steven "to think really hard about when I come testify about what I'm going to say because he has his people watching the case and for me just to really, really think when I go to bed that night about how I'm going to proceed." Figueroa's demeanor was "[v]ery cool, very just serious, almost kind of demanding." Based on Steven's relationship with Figueroa and "knowing how he is," Steven took the statement as a threat.

After hearing the evidence and the arguments of counsel, the jury returned a general guilty verdict. Following a hearing on punishment, jurors found all four enhancement paragraphs alleged in the indictment to be true, and the trial court sentenced Figueroa to life imprisonment and a $10,000 fine. This appeal followed.

21

**DISCUSSION**

I.       **Evidentiary Sufficiency**

In his first issue, Figueroa contends that "[t]here is legally insufficient evidence of intent to sustain the conviction for murder." He argues that there was no more than "a weak, mere modicum" of evidence that Kathryn was leaving him; that there was no evidence that he was going to take their son and leave her; that "there was no physical or financial abuse proven"; that there was no evidence of planning; and that his "behavior after the shooting further supports that this was not murder."

Due process requires that the State prove, beyond a reasonable doubt, every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 313 (1979); *Lang v. State*, 561 S.W.3d 174, 179 (Tex. Crim. App. 2018). When reviewing the sufficiency of the evidence to support a conviction, we consider all the evidence in the light most favorable to the verdict to determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We measure the sufficiency of the evidence against the hypothetically correct jury charge. *Garcia v. State*, 667 S.W.3d 756, 762 (Tex. Crim. App. 2023).

In conducting our review, we evaluate all the evidence in the record, whether direct or circumstantial, properly or improperly admitted, or submitted by the prosecution or the defense. *Thompson v. State*, 408 S.W.3d 614, 627 (Tex. App.—Austin 2013, no pet.); *see Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014). We presume

that the factfinder resolved conflicts in the evidence, weighed it, judged its credibility, and drew reasonable inferences from it in a manner that supports the verdict. *Jackson*, 443 U.S. at 318; *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018); *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). When performing an evidentiary-sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Arroyo v. State*, 559 S.W.3d 484, 487 (Tex. Crim. App. 2018). Our concern is whether the factfinder reached a rational decision. *Id.*; *see Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (observing that reviewing court's role on appeal "'is restricted to guarding against the rare occurrence when a fact finder does not act rationally'" (quoting *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010))).

As charged in this case, a person commits murder if he

(1) intentionally or knowingly causes the death of an individual;

(2) intends to cause [SBI] and commits an act clearly dangerous to human life that causes the death of an individual; [or]

(3) commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, the person commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

Tex. Penal Code § 19.02(b)(1)–(3). The first two manners of committing the offense are result-oriented. *See Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2012) (holding that "murder under Section 19.02(b)(2) is a 'result' crime"); *Cook v. State*, 884 S.W.2d 485, 491 (Tex. Crim. App. 1994) (holding that "intentional murder under § 19.02(a)(1)[4] is a 'result of conduct'

---

[4] The statute under consideration in *Cook*, Penal Code subsection 19.02(a)(1), is substantively identical to current subsection 19.02(b)(1). *See* Act of May 28, 1973, 63d Leg., R.S.,

23

offense"); *cf. Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999) (stating that "a knowing murder under 19.02(b)(1) is a result-of-conduct offense which by definition is also a nature-of-conduct offense"). Subsection 19.02(b)(3), by contrast, "dispenses with a culpable mental state" so that "there is no culpable mental state 'for the act of murder'" in felony-murder. *Lomax v. State*, 233 S.W.3d 302, 307 (Tex. Crim. App. 2007). Instead, "it is the underlying felony itself, and not the felony-murder statute, that determines whether the underlying felony requires a culpable mental state." *Id.* The underlying, or predicate, felony in this case was aggravated assault, another result-oriented offense, which—as charged—is committed when a person "intentionally, knowingly, or recklessly causes [SBI] to another." *See* Tex. Penal Code § 22.02(a)(1); *Landrian v. State*, 268 S.W.3d 532, 536 (Tex. Crim. App. 2008) (noting that aggravated assault is result-oriented offense).

Thus, Figueroa acted "intentionally" if it was "his conscious objective or desire" to cause Kathryn's death or to cause her SBI (for purposes of subsections 19.02(b)(2) and (b)(3)). *See* Tex. Penal Code § 6.03(a). He acted "knowingly" if he was aware that his conduct was "reasonably certain" to cause her death, *see id.* § 6.03(b), and also aware "of the lethal nature of his conduct," *see Medina*, 7 S.W.3d at 640; *Owens v. State*, 549 S.W.3d 735, 741 (Tex. App.—Austin 2017, pet. ref'd). And he acted "recklessly" if he was "aware of but consciously disregard[ed] a substantial and unjustifiable risk" that her death would occur. *See* Tex. Penal Code § 6.03(c). The risk had to be "of such a nature and degree that its disregard constitute[d] a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from [Figueroa's] standpoint." *Id.*

---

ch. 426, art. 2, § 1, sec. 19.02(a)(1), 1973 Tex. Gen. Laws 1122, 1123 (amended 1994) (current version at Tex. Penal Code § 19.02(b)(1)); 884 S.W.2d 485, 491 (Tex. Crim. App. 1994).

Because the jury returned a general verdict, the evidence was sufficient if it supported a finding of guilt under any of the three charged manners of committing murder. *See Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012) ("When a jury returns a general guilty verdict on an indictment charging alternate methods of committing the same offense, the verdict stands 'if the evidence is sufficient to support a finding under any of the theories submitted.'" (quoting *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991))). For purposes of our review, the verdict is "applied to the paragraph finding support in the facts," and "evidence is not to be held insufficient because of a defect in the court's charge." *Manrique v. State*, 994 S.W.2d 640, 642 (Tex. Crim. App. 1999).

Direct evidence of a defendant's mental state is not required for there to be sufficient evidence of guilt. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). Intent to kill can be inferred from circumstantial evidence such as the defendant's acts and words, the victim's injuries, the use of a deadly weapon, the concealment of evidence, failure to seek help for the victim, and the defendant's flight from the scene. *Gonzalez v. State*, 616 S.W.3d 585, 594 (Tex. Crim. App. 2020); *Cavazos*, 382 S.W.3d at 384; *Torres v. State*, 691 S.W.3d 138, 154 (Tex. App.—Austin 2024, pet. ref'd). "Indeed, mental culpability is of such a nature that it generally must be inferred from the circumstances under which a prohibited act or omission occurs," *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991) (internal citations omitted), *overruled on other grounds by Fuller v. State*, 829 S.W.2d 191 (Tex. Crim. App. 1992), and jurors "may infer that a defendant intends the natural consequences of his acts," *Owens*, 549 S.W.3d at 741.

The jury in this case heard extensive evidence from which, viewed in the light most favorable to its verdict, it could infer Figueroa's intent to kill Kathryn. A litany of text messages between the two, as well as testimony from Hill, Quarnberg, Koch, Steven, and Conner supported

25

the inference that Figueroa abused Kathryn emotionally, verbally, and physically. In texts from the days and months preceding her death, he repeatedly threatened and insulted her, accused her of cheating, demanded that she leave their house, and insisted that she send him her location or tell him what she was doing. She was not even allowed to disable their house's alarm without notifying him. The "vast majority" of her communication was with him, and he had made her delete her social media accounts, except for a Facebook profile that she seldom used. Quarnberg and Koch lost contact with Kathryn after she moved to Texas, and Hill never spoke with Kathryn again following Figueroa's eruption at dinner. Following the dinner, Figueroa texted Kathryn, "You probably won't be seeing her on purpose again." Although Figueroa admitted that he had in fact been cheating on Kathryn, Steven testified that Figueroa made Kathryn take a polygraph test, and Detective Lewis recovered a voicemail from the polygraph company on one of Kathryn's phones.

The abuse, however, was also physical. Figueroa asked Steven on multiple occasions if he could see bruises on Kathryn's face beneath her makeup and once told Steven that he had caused the bruising. In one text, Figueroa told Kathryn that her face needed makeup. In another, sent when she was pregnant, he stated that he would not "touch" her on that occasion only because he was not "gonna hurt [his] child ever." Moreover, during Kathryn's autopsy, Edelman, the deputy chief medical examiner, observed bruises in various stages of healing on Kathryn's jaw, chest, hip, forearm, hand, and legs. Figueroa offered no explanation for the bruises to her body but claimed that those on her face were hickies. However, Steven testified that Figueroa would put hickies only on his partners' necks.

Much of the evidence pertaining to Figueroa and Kathryn's relationship was consistent with Conner's description of patterns and dynamics in abusive relationships. Conner testified that controlling behavior eventually leads to violence, which becomes more physical over

26

time; that a victim preparing or attempting to leave her abuser is at a heightened risk of being killed; and that a victim's not responding to an abuser—such as the final three unanswered Facetime calls made by Figueroa on the night of the shooting—would result in "punishment or retribution."

There was evidence that Kathryn was preparing to leave Figueroa at the time of her death. On August 10, she accessed an online USPS change-of-address form, and Koch testified that she and her daughter had arranged for Kathryn and her son to live with Koch in Oklahoma. According to Steven, Figueroa had previously told him that he "wouldn't let her" take their son, and in February 2021, in response to Kathryn stating that Figueroa no longer wanted to spend time with her, he responded, "I just want my son"; "Fuck you"; "You have no idea what you['re] doing." Next to Kathryn's body was the promise ring that he had given her. A reasonable juror could have inferred from evidence of the couple's problems and of Kathryn's plan to leave Figueroa that she had voluntarily removed the ring. Such an inference is supported by the contradiction in Figueroa's testimony that it was oversized but that she wore it "all the time" and by the unlikelihood of the ring falling off precisely at the moment of her death. In addition to the ring, Kathryn's clothing and shoes were laid out next to a large backpack or suitcase on an upstairs bed, as though she had been packing.

Other evidence from the crime scene and testimony about the day of the shooting further indicated that the shooting was intentional. Figueroa was inconsistent as to the number of drinks he had with Hildebrandt, and Hill's testimony showed that Figueroa could be volatile and angry when drinking. On the night of August 12, Figueroa called Kathryn ten times over six hours using Facetime video. The takeout food he brought home was strewn about on the floor and wall

27

by the front door, and the container—according to him—was "ripped in two pieces" and appeared to have been kicked. He could not explain how it came to be in that state.

Firearm and ballistics evidence was also consistent with an intentional shooting. Both Figueroa and Steven testified that Figueroa was aware of the rule never to put one's finger on the trigger unless one intended to fire. Although Figueroa later testified that Kathryn must have chambered a round in her handgun without his knowledge, he initially testified that she did not keep a round chambered because she knew it made him uncomfortable and agreed that she "certainly would have never had a round in her chamber in her gun." Kelly, the firearms examiner, testified that a shooter must activate the slide to load a round into the firing chamber of a semiautomatic firearm.

Significantly, the jury could have found Figueroa's testimony that he thought he was using his own Glock 17—and therefore that he thought there was no round chambered—not to be credible. At no point did he explain or offer evidence as to why the case in which Kathryn kept her handgun was lying on the floor next to her body. He testified that she kept her Glock 17 inside its case in a drawer in the upstairs bedroom. Yet he testified that he picked up the handgun used in the shooting from the couch—one of two locations where he testified he kept his own firearms—and made no mention of the case. Moreover, he testified that she used a "standard magazine"—which Steven explained holds eight rounds—and that he had bought an aftermarket magazine, which Steven identified as an extended magazine holding approximately nineteen rounds. Steven testified that someone with firearms experience, like Figueroa, "would know whether or not an extended magazine was in a firearm." Alternatively, while there was evidence that the handgun used in the shooting may have had an extended magazine (Kelly testified that the

28

handgun's magazine held seventeen cartridges) Figueroa failed to explain why his magazine would have been in Kathryn's Glock.

Figueroa also failed to explain how he was able—while simply raising his hands—to disengage all three of the Glock's internal safeties and to apply seven pounds of pressure to the trigger. What is more, Edelman testified that the forensic evidence showed that the "[t]he gun was pointed at [Kathryn's] face"; that "the muzzle of the gun was pointed, basically, perpendicular to [her] face, not like angled"; and that the gunshot's trajectory was "directly front to back" and "slightly upward." A rational juror could have found incredible the theory that as Figueroa threw his hands up, he accidentally placed his finger on the trigger, depressed it with the same force required to open a Coke can, disengaged all three of the Glock's internal safeties, and happened to shoot Kathryn in the middle of her face from several inches away with no horizontal angling—and little vertical angling—of the muzzle.

Edelman testified that she saw no evidence that Figueroa attempted any lifesaving measures after shooting Kathryn and that Edelman would have expected to see some indication had he performed CPR, as he testified he did. Instead of using his cellphone to call 911, he called his parents and Steven, whom he kept from calling police for almost four hours. Figueroa told Steven that he and Kathryn had been fighting and that, rather than shoving him playfully, she had "tried to swing and hit him in the face." He put the handgun in her hand to make it appear that she had committed suicide, only abandoning the idea because it did not "make sense." His primary concern in the shooting's aftermath was his own wellbeing; he told Steven that he had ruined his life and did not want to go to jail. Once Steven left, Figueroa fled, taking his and Kathryn's son and a large quantity of drugs but no items necessary for the infant's care. Pulled over after running

29

from police, he initially refused to hand over his driver's license and lied about his reason for being in Cedar Park.

Figueroa's admissions that he shot Kathryn and caused her death were substantial evidence of his intent. *See Rodriguez v. State*, 629 S.W.3d 229, 234 (Tex. Crim. App. 2021) (stating that defendant's "admitted use of a deadly weapon also supported an intent to kill"); *Cavazos*, 382 S.W.3d at 384 (noting that "the specific intent to kill may be inferred from the use of a deadly weapon"); *Ex parte Thompson*, 179 S.W.3d 549, 556 n.18 (Tex. Crim. App. 2005) (reasoning that "pointing a loaded gun at someone and shooting it toward that person at close range demonstrates an intent to kill"); *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996) ("The jury may infer the intent to kill from the use of a deadly weapon unless it would not be reasonable to infer that death or [SBI] could result from the use of the weapon."). The location of the gunshot wound and trajectory of the gunshot likewise supported the conclusion that the shooting was intentional. *See Hart*, 89 S.W.3d at 64 ("A jury may infer intent from . . . the nature of wounds inflicted on the victims." (quoting *Manrique*, 994 S.W.2d at 649 (Meyers, J. concurring)).

In addition, the jury heard evidence that Figueroa had motive to kill Kathryn to prevent her from leaving with their son; that he attempted to make her death look like a suicide and concealed a bloodstained hat in the trash; that he offered shifting, inconsistent, and dubious accounts of what occurred inside the house; that he failed to help her or to seek medical assistance; and that he fled the scene. *See Gonzalez*, 616 S.W.3d at 594; *Torres*, 691 S.W.3d at 154; *see also Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Motive is a significant circumstance indicating guilt.").

From this evidence—considered in its totality and under the applicable standard of review—a reasonable juror could have found beyond a reasonable doubt that Figueroa's conscious

30

desire or object was to cause Kathryn's death. *See Jackson*, 443 U.S. at 313; *Lang*, 561 S.W.3d at 179; *see also* Tex. Penal Code § 6.03(a). Because we conclude that there was sufficient evidence that he intentionally or knowingly caused her death, the manner alleged in the indictment's first paragraph, we need not address whether the evidence was also sufficient to prove the manners alleged in the second and third paragraphs. *See Sanchez*, 376 S.W.3d at 775; *Manrique*, 994 S.W.2d at 642. We overrule Figueroa's first issue.

## II.      Jury-Charge Error

In his second issue, Figueroa contends that the guilt-innocence jury charge "erroneously authorized a murder conviction for felony murder based on the predicate felony of aggravated assault causing [SBI] committed recklessly." He argues that use of reckless aggravated assault causing SBI as the predicate felony in a felony-murder indictment is impermissible because the offense is a lesser-included offense of manslaughter. The State responds that reckless aggravated assault, as alleged in the indictment, is not a lesser-included offense of manslaughter because the State alleged "the elements for both statutory means of committing [a]ggravated [a]ssault," including the "additional element" of a deadly weapon.

A trial court is statutorily obligated to instruct the jury on the "law applicable to the case." *See* Tex. Code Crim. Proc. art. 36.14; *Mendez v. State*, 545 S.W.3d 548, 552 (Tex. Crim. App. 2018). The jury charge should tell the jury what law applies and how it applies to the case. *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007). The trial court's duty to instruct the jury on the "law applicable to the case" exists even when defense counsel fails to object to inclusions or exclusions in the charge. *Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013). The trial court is "'ultimately responsible for the accuracy of the jury charge and

31

accompanying instructions.'" *Mendez*, 545 S.W.3d at 552 (quoting *Delgado*, 235 S.W.3d at 249). We review alleged jury-charge error in two steps: first, we determine whether error exists; if so, we then evaluate whether sufficient harm resulted from the error to require reversal. *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022).

## A.    Error

"Felony murder is an unintentional murder committed in the course of committing a felony." *Threadgill v. State*, 146 S.W.3d 654, 665 (Tex. Crim. App. 2004). Under subsection 19.02(b)(3), the felony-murder statute, the predicate felony must be a felony "other than manslaughter." Tex. Penal Code § 19.02(b)(3). An offender commits manslaughter by recklessly causing the death of another person. *See id.* § 19.04(a). The Court of Criminal Appeals has construed the felony-murder statute to exempt from the rule "not only manslaughter, but also lesser included offenses of manslaughter." *Johnson v. State*, 4 S.W.3d 254, 255 (Tex. Crim. App. 1999). The exemption is logical; "[i]f involuntary manslaughter could form the basis of a felony murder prosecution, each and every such recklessly caused death would constitute felony murder," and manslaughter "would be swallowed up by the felony murder rule." *Lawson v. State*, 64 S.W.3d 396, 398 (Tex. Crim. App. 2001) (Cochran, J., concurring).

When reviewing entitlement to a lesser-included-offense instruction, courts apply the cognate-pleadings approach, the first step of which involves determining as a matter of law whether a lesser offense is included within the charged offense. *Hernandez v. State*, 631 S.W.3d 120, 123 (Tex. Crim. App. 2021); *Hall v. State*, 225 S.W.3d 524, 535 (Tex. Crim. App. 2007). The step is satisfied if "the elements and any descriptive averments in the charging instrument include all the elements of the proposed lesser, without regard to the facts of a given case." *Hernandez*,

32

631 S.W.3d at 123. In other words, the comparison is between "the statutory elements of the alleged lesser offense and the statutory elements *and any descriptive averments* in the indictment." *Ritcherson v. State*, 568 S.W.3d 667, 670–71 (Tex. Crim. App. 2018) (emphasis added); *Ex parte Benson*, 459 S.W.3d 67, 72 (Tex. Crim. App. 2015) ("[T]he cognate-pleadings approach . . . entails comparing the elements of the greater offense as pleaded to the statutory elements of the lesser offense.").

In *Fraser v. State*, the Court of Criminal Appeals rejected the cognate-pleadings approach for purposes of determining lesser offenses of manslaughter under the felony-murder rule. *See* 583 S.W.3d 564, 569 (Tex. Crim. App. 2019). The indictment charged Fraser with felony murder in two paragraphs, alleging predicate felonies of injury to a child and endangering a child, respectively. *See id.* at 565–66. Fraser urged the court to use the cognate-pleadings approach and contended that "because the victim's status as a child is in the indictment, that status has to be incorporated as one of the elements of manslaughter." *Id.* at 567.

The court declined Fraser's invitation and emphasized that unlike the cognate-pleadings approach, the analysis under the felony-murder rule does not compare the charged offense to anything. *Id.* at 568. "Instead, the predicate felonies . . . are compared to an uncharged statutory offense (manslaughter) that is disqualified from being a predicate felony." *Id.* A "strict statutory approach" is therefore appropriate for determining the elements of manslaughter, which are then compared with the statutory elements of the alleged lesser offense. *See id.* at 568–69. The court reasoned:

> Because the victim's status as a child is necessarily an element of the offenses of injury to a child and child endangerment, and that element is not within (or deducible from) the statutory elements of manslaughter, the offenses of injury to a

33

> child and child endangerment are never lesser-included offenses of manslaughter for the purpose of the felony-murder statute's manslaughter exclusion.

*Id.* at 565. In following the court's reasoning, we have since agreed that under the felony-murder rule's manslaughter-exemption analysis, "we 'look solely to the statutory elements of manslaughter' and those of the purported lesser included offense and ignore the indictment." *Keen v. State*, No. 03-19-00744-CR, 2021 WL 4819078, at *7 (Tex. App.—Austin Oct. 15, 2021, pet. ref'd) (mem. op., not designated for publication) (quoting *Fraser*, 583 S.W.3d at 569). Accordingly, the relevant inquiry in this case is not how the State charged aggravated assault as a predicate offense of felony-murder; the inquiry is whether all of the statutory elements of aggravated assault are included within or deducible from the statutory elements of manslaughter. *See Fraser*, 583 S.W.3d at 565.

Under the Texas Penal Code, a person commits assault if he intentionally, knowingly, or recklessly causes bodily injury to another. *Wade v. State*, 663 S.W.3d 175, 183 (Tex. Crim. App. 2022); *see* Tex. Penal Code § 22.01(a)(1). A person commits aggravated assault if he commits assault and either: (1) causes SBI to another, or (2) uses or exhibits a deadly weapon during the commission of the assault. *Wade*, 663 S.W.3d at 183; *see* Tex. Penal Code § 22.02(a); *see also Ortiz v. State*, 623 S.W.3d 804, 807 (Tex. Crim. App. 2021) ("[A]ggravated assault is a bodily-injury assault plus aggravating elements of [SBI] or use of a deadly weapon.").

The application paragraph in this case, mirroring the indictment, combined the two aggravating factors, authorizing the jury to find Figueroa guilty if it found beyond a reasonable doubt that on or about August 12, he

> [c]ommit[ted] or attempt[ted] to commit a felony, namely Aggravated Assault with a Deadly Weapon against Kathryn Lynn Gibson by intentionally, knowingly or recklessly causing [SBI] to Kathryn Lynn Gibson by shooting Kathryn Lynn

34

Gibson, and the defendant used or exhibited a deadly weapon, namely a firearm during the commission of the assault and in the course of and in furtherance of the commission of the attempt, the defendant committed or attempted to commit an act clearly dangerous to human life that caused the death of Kathryn Lynn Gibson by shooting Kathryn Lynn Gibson with a firearm.

Yet as noted above, under the *Fraser* approach, we are concerned not with the paragraph's particular language, which reflects what the State in its brief contends was the intentional appendment of a deadly-weapon element to SBI aggravated assault, but with the statutory elements of the offense, which contain no deadly-weapon element. As noted above, the statutory elements of SBI aggravated assault are that a person intentionally, knowingly, or recklessly causes SBI to another, including the person's spouse. Tex. Penal Code § 22.02(a)(1).[5]

The Court of Criminal Appeals expressly recognized in *Fraser* that "[a]t least one version of aggravated assault *is* a lesser-included offense of manslaughter in the abstract—when the defendant acts recklessly and causes [SBI]." 583 S.W.3d at 570. We reached the same conclusion in *Keen*, when we applied the *Fraser* approach and agreed that "reckless aggravated bodily-injury assault is a lesser included offense of manslaughter." 2021 WL 4819078, at *7; *see Lujan v. State*, No. 08-22-00165-CR, 2023 WL 3510430, at *9 (Tex. App.—El Paso May 17, 2023, pet. ref'd) (not designated for publication) (determining that "the inclusion of 'recklessly' in the definition of a lesser-included offense of manslaughter (here, aggravated assault) that could have been used as a predicate offense for felony murder constituted error").

---

[5] It is for this reason that we find unpersuasive Figueroa's argument that aggravated assault is akin to the offenses under consideration in *Fraser*. As the *Fraser* court noted, a child-victim's age is an essential element of injury to a child and endangering a child; use or exhibition of a deadly weapon, by contrast, is not an element of SBI aggravated assault. *See Fraser v. State*, 583 S.W.3d 564, 568 (Tex. Crim. App. 2019).

Applying the *Fraser* approach to the facts of this case, we conclude that the application paragraph allowed jurors to find Figueroa guilty of felony-murder using a predicate offense that is a lesser-included offense of manslaughter. We conclude that the charge was erroneous for that reason. *See Fraser*, 583 S.W.3d at 570; *Lujan*, 2023 WL 3510430, at *9; *Keen*, 2021 WL 4819078, at *7. Having found error, we must next consider whether it was harmful. *See Alcoser*, 663 S.W.3d at 165.

## B. Harm

When, as here, the defendant does not make a timely objection during the proceedings below, we must determine whether the record establishes that the error caused him "egregious harm." *See Gonzalez v. State*, 610 S.W.3d 22, 27 (Tex. Crim. App. 2020). Errors that result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory. *Id.*; *see Chambers v. State*, 580 S.W.3d 149, 154 (Tex. Crim. App. 2019) (stating that egregious harm occurs when error "created such harm that the appellant was deprived of a fair and impartial trial"). The appellant must have suffered actual, and not merely theoretical, harm. *Gonzalez*, 610 S.W.3d at 27; *see Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002) (stating "that egregious harm is a difficult standard" to meet). In determining whether egregious harm exists, we must evaluate the entire record in light of four factors: 1) the complete jury charge; 2) the arguments of counsel; 3) the entirety of the evidence, including the contested issues and weight of the probative evidence; and 4) any other relevant factors revealed by the record as a whole. *Gonzalez*, 610 S.W.3d at 27; *Hollander v. State*, 414 S.W.3d 746, 749–50 (Tex. Crim. App. 2013).

36

When a jury charge alleges alternative theories of committing an offense, as did the jury charge in this case, "harm must be measured 'at least in part against the likelihood that the jury's verdict was actually based upon an alternative available theory of culpability not affected by erroneous portions of the charge.'" *Sanchez*, 376 S.W.3d at 775 (quoting *Atkinson v. State*, 923 S.W.2d 21, 27 (Tex. Crim. App. 1996), *overruled on other grounds by Motilla v. State*, 78 S.W.3d 352 (Tex. Crim. App. 2002)). "When a jury returns a general guilty verdict on an indictment charging alternate methods of committing the same offense, the verdict stands 'if the evidence is sufficient to support a finding under any of the theories submitted.'" *Id.* (quoting *Kitchens*, 823 S.W.2d at 258). Thus, the "'presence of overwhelming evidence of guilt plays a determinative role in resolving the issue' and may be considered when assessing jury-charge error." *Id.* (quoting *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989), *overruled on other grounds by Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011)). "[E]ven if one of the alternative theories was erroneously submitted to the jury, a conviction still may stand if found under another submitted theory." *Brown v. State*, 580 S.W.3d 755, 763 (Tex. App.— Houston [14th Dist.] 2019, pet. ref'd); *see McDow v. State*, No. 05-17-01201-CR, 2019 WL 2590968, at *8 (Tex. App.—Dallas June 25, 2019, no pet.) (mem. op., not designated for publication) (concluding that because evidence was sufficient to support defendant's murder convictions under subsections 19.02(b)(1) and 19.02(b)(2), any error in jury charge as to felony-murder allegations under subsection 19.02(b)(3) did not cause defendant egregious harm); *see also Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008) ("An instructional error arising in the context of multiple theories of guilt no more vitiates all the jury's findings than does omission or misstatement of an element of the offense when only one theory is submitted.").

As discussed at length above, there was overwhelming evidence that Figueroa intentionally caused Kathryn's death, the theory alleged in the indictment's first paragraph. *See Campbell v. State*, 664 S.W.3d 240, 252 (Tex. Crim. App. 2022) (noting that state of evidence weighed against finding of harm where "State's case for guilt was exceedingly strong"). This fact alone largely, if not dispositively, mitigates the error in the application paragraph pertaining to the theory of felony-murder and supports the determination that Figueroa was not egregiously harmed by the error. *See Sanchez*, 376 S.W.3d at 775; *Harris*, 790 S.W.2d at 587; *Brown*, 580 S.W.3d at 763; *McDow*, 2019 WL 2590968, at *8. The remainder of the charge neither supports nor undermines that determination. Although Figueroa notes that the charge defined recklessness twice and disputes the order in which the trial court instructed the jury on the lesser-included offenses of aggravated assault with a deadly weapon, manslaughter, and criminally negligent homicide, the charge also defined intent and knowledge, and Figueroa's arguments amount at most to theoretical, not actual harm. *See Gonzalez*, 610 S.W.3d at 27; *Sanchez*, 376 S.W.3d at 775. For these reasons, the first and second factors weigh strongly against finding that Figueroa was egregiously harmed.

With respect to the parties' arguments, around two pages of the State's closing argument are expressly directed to the theories in the indictment's first two paragraphs and two-and-a-half pages to the felony-murder theory, which the State explained was "the most complicated." However, the State spent another two-and-a-half pages arguing that "none of [Figueroa's choices] were accidents" and highlighting evidence that he acted intentionally. And in its rebuttal, the State similarly recapitulated evidence that he knew the handgun had been loaded, that Kathryn had been in the process of leaving him at the time of the shooting, and that ballistics indicated the gunshot had been intentional. *See French v. State*, 563 S.W.3d 228, 238 (Tex. Crim.

App. 2018) (explaining that State's closing arguments focused jury's attention in way that rendered charge error harmless).

The defense's principal argument was that the State had failed to prove any of its three theories. However, defense counsel partially mitigated the error in the felony-murder charge by asserting that all of the theories in effect required a finding of intent:

> Why is this not murder? Murder requires a person, in one of the definitions, to intentionally or knowingly kill another—there are three definitions—or to— intending to caus[e SBI], do something dangerous to human life, or attempting to cause aggravated assault with [SBI].
>
> Really, in any of those situations, there's some level of intent to kill or cause [SBI].

Although counsel distinguished between intent to kill and intent to cause SBI, a reasonable juror would likely have found little distinction between intentionally murdering someone and intentionally causing SBI by shooting her in the face. This reality—that it is difficult to imagine circumstances in which Figueroa shot Kathryn in the face intending to cause SBI but not her death—emphasized by counsel's argument, vitiated some of the error's significance. We conclude that the parties' arguments weigh at most slightly in favor of finding egregious harm. *See Gelinas v. State*, 398 S.W.3d 703, 709 (Tex. Crim. App. 2013) (plurality op.) (emphasizing "that jury arguments bear significantly on a[ harm] analysis").

Regarding "other relevant factors," we note only that nothing in the record indicates that the jury—which did not submit any questions to the trial court during its deliberations—was confused by the jury charge. *See Torres*, 691 S.W.3d at 154–55. Although the State in its brief argues that we should also consider the brevity of those deliberations, we do not consider the deliberations' length a reliable indicator of the degree of harm in this case; indeed, it is conceivable that shorter deliberations are to be expected when the predicate felony of a felony-murder charge

39

is a lesser-included offense of manslaughter. We conclude that this factor weighs neither in favor of nor against finding egregious harm.

Balancing the four factors, we ultimately conclude that Figueroa was not egregiously harmed by the charge error in this case. We overrule his second issue.

## III. Motion for Mistrial

In his third issue, Figueroa contends that the trial court abused its discretion by overruling his motion for mistrial, made after Steven's unredacted 911 call—which included a statement that Figueroa had called himself "a two-time felon"—was played for the jury.

As a preliminary matter, we must determine whether this issue was preserved for appellate review. Preservation of error is a "systemic requirement" on appeal. *Darcy v. State*, 488 S.W.3d 325, 327–28 (Tex. Crim. App. 2016). If an issue has not been preserved for appeal, we should not address the merits of that issue. *Blackshear v. State*, 385 S.W.3d 589, 591 (Tex. Crim. App. 2012). Ordinarily, we should review preservation of error on our own motion regardless of whether the issue is raised by either of the parties. *See Darcy*, 488 S.W.3d at 328; *Mays v. State*, 285 S.W.3d 884, 889 (Tex. Crim. App. 2009).

Motions for mistrial are subject to Texas Rule of Evidence 33.1, *Griggs v. State*, 213 S.W.3d 923, 927 (Tex. Crim. App. 2007), which requires a timely, specific objection and a ruling by the trial court to preserve a complaint for appellate review, Tex. R. App. P. 33.1(a). While an "unforeseeable occurrence"—such the playing of the unredacted 911 call, which surprised both parties—obviates the requirement of an objection, there must still be "a timely, specific request that the trial court refuses." *See Young v. State*, 137 S.W.3d 65, 69–70 (Tex. Crim.

App. 2004). "A motion for mistrial is timely only if it is made as soon as the grounds for it become apparent." *Griggs*, 213 S.W.3d at 927.

The publication of the unredacted 911 call occurred without objection during Steven's testimony near the end of the first day of the trial on the merits. After the call was played, Steven testified for a further forty-one pages. At the conclusion of his testimony, the following exchange occurred during a bench conference outside the jury's presence:

> THE STATE: On State's Exhibit 36, which is the 911 call, there is a small portion at the end of the exhibit that the State intended to redact, and this is the unredacted version. So we spoke with [defense counsel] on the break about our intentions on how we would like to handle that. I think we both agreed that we would redact the portion that needs to be redacted and swap that with this jump drive so that the correct, redacted copy would be the exhibit that could be submitted for the jury.
>
> . . . .
>
> DEFENSE COUNSEL: I agree with that approach . . . . We'll probably request a limiting instruction but not until the charge. We don't want to draw any attention to it.

The matter was not addressed again until the following morning, when defense counsel requested a limiting instruction be given in the trial court's written guilt-innocence jury charge. The trial court granted counsel's request, and counsel then stated, "Judge, I think as a— just a procedural matter to preserve any error, I have to ask the Court to grant a mistrial based on the admission of that statement." The trial court denied counsel's motion.

From these facts, we conclude that Figueroa's motion for mistrial was untimely and that he therefore failed to preserve error regarding its denial. *See id.*; Tex. R. App. P. 33.1; *see also Foyt v. State*, 602 S.W.3d 23, 49–50 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd) (concluding that motion for mistrial was not timely when defendant did not move for mistrial

41

during witness's direct examination by State and instead waited until next day after witness had left witness stand). We overrule his third issue. *See Blackshear*, 385 S.W.3d at 591.

## IV.    Extraneous-Offense Notice

In his fourth issue, Figueroa contends that the trial court abused its discretion "in admitting the unnoticed prior bad acts testimony elicited in rebuttal through State's witness Steven Gomez over defense objection." He asserts that he requested notice of extraneous bad acts under article 37.07 of the Texas Code of Criminal Procedure and rules 404(b) and 609(f) of the Rules of Evidence and argues that the State's oral notice "was untimely regardless of whether the untimeliness may have been outside of the State's control." The State responds that under the relevant statutes, it "was not required to give notice of extraneous offense testimony it used in rebuttal."

At a bench conference before Steven's testimony, the State informed the trial court and defense counsel that during lunch, Steven had indicated to the State's attorney for the first time that "although [Steven] had never seen acts of physical violence, [Figueroa] did discuss with him acts of physical violence that he perpetrated against Kathryn." The State explained that it was going to ask Steven about only "how [Figueroa and Kathryn] interacted with each other" and not about Figueroa's statements regarding specific "instances of conduct." Defense counsel stated that

> with respect to . . . the Steven Gomez evidence or testimony that he says Mr. Figueroa told him he had committed acts of violence, I think the State just learned of that today. We're just learning of that now, so we clearly have not been noticed of the existence of that prior statement or that prior evidence of some other wrongful act. We would, of course, object to any other hearsay-based statements about any other acts of physical violence against the decedent in the case.

42

The State's attorney confirmed that she did not intend to pursue that line of questioning but advised, "I do think that depending on the defendant's testimony, if he still chooses to testify, it could open the door to some of that. It could also, potentially, be rebuttal evidence, depending, again, on how the defendant testifies."

In light of Figueroa's testimony that Steven was lying if he said that Figueroa had asked him whether he could see bruises on Kathryn's face, the State called Steven as a rebuttal witness. During Steven's rebuttal testimony, defense counsel "renew[ed his] earlier objection" when the State asked Steven if there had been occasions prior to the shooting when Figueroa "would talk to you about physical abuse that he perpetrated onto Kat[hryn]"? The trial court overruled the objection, and counsel requested a running objection, which the trial court granted. Steven went on to testify about conversations concerning Figueroa's physical abuse of Kathryn, which were described above.

Rule 404(b) requires in part that on a defendant's timely request, the State provide pretrial notice of evidence that it intends to introduce "in its case-in-chief." Tex. R. Evid. 404(b)(2). Article 37.07 similarly requires, "On timely request of the defendant, notice of intent to introduce evidence under this article shall be given in the same manner required by Rule 404(b), Texas Rules of Evidence." Tex. Code Crim. Proc. art. 37.07, § 3(g).[6]

By limiting their notice provisions to the State's case-in-chief, both rule 404(b) and article 37.07 exclude from the provisions' scope evidence presented in rebuttal. *See Dabney v. State*, 492 S.W.3d 309, 317 (Tex. Crim. App. 2016) (recognizing "an exception to [rule

---

[6] Rule 609 pertains to impeachment of a witness's credibility by evidence of a criminal conviction. *See* Tex. R. Evid. 609(f). The rule was not implicated by Steven's rebuttal testimony and is not germane to this analysis.

404(b)'s] notice requirement when the defense opens the door to such evidence by presenting a defensive theory that the State may rebut using extraneous-offense evidence"); *Jaubert v. State*, 74 S.W.3d 1, 4 (Tex. Crim. App. 2002) ("The extraneous offense evidence in this case was introduced during cross-examination and rebuttal testimony, not in the State's case-in-chief. Therefore, appellant was not entitled to notice of the extraneous offenses [under article 37.07]."); *Morales v. State*, 389 S.W.3d 915, 920 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("[T]he notice requirements of article 37.07, section 3(g), apply only to evidence presented during the State's case-in-chief, not during cross-examination or rebuttal."); *Stringer v. State*, 845 S.W.2d 400, 403 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd) ("Because the State offered evidence of the extraneous offenses on *rebuttal* only, and not during its *case in chief*, the plain reading of the rule defeats appellant's notice argument."); *Yohey v. State*, 801 S.W.2d 232, 235 (Tex. App.—San Antonio 1990, pet. ref'd) ("By its very terms [rule 404(b)'s] notice requirements are not applicable to rebuttal evidence.").

Because the complained-of evidence was presented in Steven's rebuttal testimony, the State had no obligation to provide Figueroa with pretrial notice of the evidence under either rule 404(b) or article 37.07. To require otherwise would "would impose upon the State the impossible task of anticipating, prior to the beginning of trial, any and all potential defenses that a defendant may raise." *See Dabney*, 492 S.W.3d at 317. We therefore overrule Figueroa's fourth issue.

## V.     Modification to Correct Clerical Error

The jury's punishment verdict includes the assessment of a $10,000 fine, and the trial judge orally pronounced during Figueroa's sentencing, "[I]n accordance with the jury's

44

verdict, I sentence you to life in prison.  Further, I impose a fine of $10,000 in accordance with the jury's verdict."  However, while the trial court's original written judgment reflected the $10,000 fine, the nunc pro tunc judgment of conviction entered on January 31, 2025, recited, "<u>Fine:</u> $0.00."

When the oral pronouncement of the sentence and the written judgment vary, the oral pronouncement controls.  *Ette v. State*, 559 S.W.3d 511, 516 (Tex. Crim. App. 2018); *see Coffey v. State*, 979 S.W.2d 326, 328 (Tex. Crim. App. 1998) ("[I]t is the pronouncement of sentence that is the appealable event, and the written sentence or order simply memorializes it and should comport therewith.").  Moreover, "A jury's lawful verdict on punishment is inviolate, and the trial court must abide by it." *Ette*, 559 S.W.3d at 517.

Appellate courts have the authority to correct or reform a judgment when the necessary information is available to do so.  *See* Tex. R. App. P. 43.2(b) (authorizing court of appeals to modify trial court's judgment and affirm as modified); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993).  Accordingly, we modify the nunc pro tunc judgment of conviction in trial court cause number 22-1471-K26 to reflect that Figueroa's sentence includes a $10,000 fine.  *See Shaw v. State*, No. 05-00-00186-CR, 2000 WL 1702582, at *3 (Tex. App.—Dallas Nov. 15, 2000, pet. ref'd) (not designated for publication) (modifying judgment to include $5,000 fine).

## CONCLUSION

Having overruled each of Figueroa's issues and having modified the trial court's nunc pro tunc judgment of conviction in trial court cause number 22-1471-K26 as stated above, we affirm the nunc pro tunc judgment of conviction as modified.

_____

Rosa Lopez Theofanis, Justice

Before Chief Justice Byrne, Justices Theofanis and Crump

Modified and, as Modified, Affirmed

Filed:   June 19, 2026

Publish